IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable R. Brooke Jackson

Civil Action No. 10-cv-02234-RBJ-MJW

NATHAN YBANEZ,

     Plaintiff,

v.

WARDEN KEVIN MILYARD,
MARY COX-BERGMAN,
STEVEN MAY, all sued in their individual and official capacities,

     Defendants.

---

ORDER

---

This matter is before the Court on plaintiff's Motion for Summary Judgment [#37] and

defendants' cross-Motion for Summary Judgment [#43].  Plaintiff filed a Response to

defendants' motion [#55] and defendants filed a Reply [#63]. The matter is fully briefed and ripe

for review.

**Facts**

The basic facts of this case were well summarized in Chief Judge Daniels' order of

September 20, 2011 [#13], in which the Court granted Rule 12(b)(6) motions dismissing original

counts three and four but denied the motion as to counts one, two and five.  I briefly summarize

the facts only to give context to the orders that follow.

Nathan Ybanez, an inmate at the Sterling Correctional Facility ("SCF") of the Colorado

Department of Corrections ("CDOC"), brings this suit *pro se* pursuant to 42 U.S.C. § 1983 and

supplemental jurisdiction with respect to state law claims.  His remaining claims arise from three

events involving mail policies and the behavior of mailroom staff at the SCF.  He names as

defendants Kevin Milyard, the warden of the SCF when the incidents involved in the case

occurred; Mary Cox-Bergman, then the Major of the SCF mail room; and Steven May, then an

acting supervisor of the SCF mail room.

Claim 1: Susan Lea Letter

In December 2008 Ms. Lea, an attorney, sent a letter to Mr. Ybanez marked as "legal

mail."  It came from "The Pendulum Foundation, 5082 E. Hampden Ave., 192, Denver, CO

80222," and identified Ms. Lea by attorney registration number 83605.  Consistent with CDOC

policy, legal mail sent to an inmate is processed through the SCF Restricted Inspection Mail

System.  This system involves the logging of the mail in a legal mail log before the mail is then

opened in the presence of the inmate.  Legal mail is not read, but it is searched for any

contraband and any "obvious indication that mail marked 'legal' is not what it purports to be."

Ms. Lea's letter to Mr. Ybanez was not sent through this process.  Mail room staff

decided that the letter had been mislabeled as legal mail, apparently because the staff could not

verify Ms. Lea's attorney registration number with the Colorado Supreme Court Attorney

Information database.  Ms. Lea is not licensed to practice law in Colorado, but she is licensed in

California and has been admitted to practice in the United States District Court for the District of

Colorado.  Mr. May, the mailroom supervisor at SCF, retained the letter from Ms. Lea.  The

letter was neither delivered to Mr. Ybanez nor returned to Ms. Lea.  It was, however, opened,

copied, reviewed by mailroom staff, and destroyed.

Mr. Ybanez was notified that Ms. Lea's letter was rejected by a "Notice of

Rejection/Disposition Slip" which gave Mr. Ybanez the option of designating a location within

30 days to which to send the mail.  Mr. Ybanez did not designate an alternative location as

outlined on the notice.  Instead, Mr. Ybanez filed a Step 1 Offender Grievance on January 15,

2009 complaining that his legal mail had been improperly handled and confiscated in violation of

mail system rules.  Exhibit 1, [#37] at 16.[1]  Defendant May responded to the grievance on

February 5, 2009, saying that the letter was being held because Ms. Lea did not appear to be a

licensed attorney.  [#43-1] at ¶51-52.  Mr. Ybanez filed a Step 2 Grievance on February 13,

2009.  Ex. 2 [#37] at 17.  Defendant Cox-Bergman responded to the second grievance with the

same explanation.  [#43-1] at ¶54.

   Mr. Ybanez requests a declaration that his right to free speech secured by the First and

Fourteenth Amendments to the United States Constitution and his state law privilege for

attorney-client communications were violated.  He requests mandatory injunctive relief requiring

defendants to implement procedures that mail not deemed "restricted inspection" will still be

delivered to the inmate through regular mail.

   Claim 2: Michael Gallagher's Christmas Card

   In December 2008 Mr. Gallagher, Mr. Ybanez's criminal attorney, sent a Christmas card

to Mr. Ybanez at SCF.  Per the restricted mail inspection process, the mail was opened in front of

Mr. Ybanez.  However, the SCF mail room staff then confiscated the card because they

determined that, as a Christmas card, it did not qualify for restricted mail inspection.  The

mailroom staff returned the Christmas card to Mr. Gallagher.  Mr. Gallagher did not resend the

card, and Mr. Ybanez never received the card.

   Mr. Ybanez filed Step 1 and 2 grievances in response to this incident as well.  Mr. May

and Mr. Cox-Bergman responded to these requests with the explanation that the card was not

---

[1] Mr. Ybanez's exhibits are included with his motion for summary judgment, not filed separately, and will be reference by Mr. Ybanez's exhibit number and docket page number.

legal in nature, and should not have been marked as "legal" according to CDOC policy. *Id.* at ¶67-68.

Mr. Ybanez seeks a declaration that his right to receive and keep mail was violated. He requests a mandatory injunction requiring training of SCF staff regarding inmates' rights to receive and keep mail under the First Amendment and mandating changes in CDOC and SCF policies that will assure that all mail received will be delivered through either the restricted or regular process, not returned to sender, unless the mail is determined to be contraband or if the intended recipient was insufficiently identified. He also seeks an award of nominal damages. [#5] at 21.

Claim 5: "Return-to-Sender" Mail

The third incident involves a policy instituted by then Warden Milyard entitled "Implementation Adjustment 300-38." This policy change required that "return-to-sender" ("RTS") mail sent back to the inmate be destroyed rather than returned to the sending inmate. Previously, RTS mail was returned to the inmate through the normal inspection mail system. Mr. Ybanez claims that since that policy was instituted, 15 of his letters have been destroyed. He requests declaratory relief stating that the refusal to deliver RTS mail solely because it was returned to the sender violates his First Amendment rights. He also requests injunctive relief prohibiting staff from refusing to deliver and instead destroying RTS mail, compensatory damages for letters wrongly destroyed, nominal damages, and punitive damages for the willful and wanton destruction of Mr. Ybanez's letters. *Id.* at 22.

**Standard**

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The

moving party has the burden to show that there is an absence of evidence to support the

nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving

party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A

fact is material "if under the substantive law it is essential to the proper disposition of the claim."

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Because defendants assert a qualified immunity defense, the summary judgment standard

is subject to a "somewhat different analysis from other summary judgment rulings." *Steffey v.*

*Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006). The qualified immunity doctrine "shields

government officials performing discretionary functions from liability for damages insofar as

their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Toevs v. Reid*, 646 F.3d 752, 755 (10th Cir. 2011)

(internal citations omitted). To overcome summary judgment based on qualified immunity, the

plaintiff "must show that the defendant's actions violated a specific statutory or constitutional

right, and that the constitutional or statutory rights the defendant allegedly violated were clearly

established at the time of the conduct at issue." *Steffey*, 461 F.3d at 1221.

### Conclusions

"Prison walls do not form a barrier separating prison inmates from the protections of the

Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987). Prisoners have a basic First

Amendment right to communicate via mail. *Gee v. Pacheco*, 627 F.3d 1178, 1188 (10th Cir.

2010). "When a prison regulation or practice offends a fundamental constitutional guarantee,

federal courts will discharge their duty to protect constitutional rights." *Turner*, 482 U.S. at 84

(citing *Procunier v. Martinez*, 416 U.S. 396, 405-06 (1974)).  However, "the regulation is valid if it is reasonably related to legitimate penological interests.  In our view, such a standard is necessary if prison administrators . . . , and not the courts, are to make the difficult judgments concerning institutional operations."  *Id.* at 89. (internal citations omitted).

In *Turner*, the Court held that in determining whether a prison regulation is reasonable a court must consider: (1) whether there is "a 'valid rational connection' between the prison regulation and the legitimate governmental interest put forward by it;" (2) whether "there are alternative means of exercising the right that remain open to prison inmates;" (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally;" and (4) whether "the absence of ready alternatives is evidence of the reasonableness of a prison regulation."  *Id.* at 89.

Even if the policy is reasonable, the individual defendants may still be liable if Mr. Ybanez can show the following: (1) his mail was mishandled; (2) the defendant was responsible for such nondelivery; and (3) that the defendant acted intentionally or with deliberate indifference.  *Treff v. Galetka*, F.3d 191, 195 (10th Cir. 2011).

**(1) Susan Lea's Letter and Michael Gallagher's Christmas Card**

With regard to his first and second claim, Mr. Ybanez challenges both the policy regarding rejected legal mail and Cox-Bergman's and May's mishandling of his mail.  Each incident and the policy at issue will be discussed below:

*Mishandling of Susan Lea's Letter*

Mr. Ybanez alleges that Cox-Bergman and May intentionally withheld legal mail sent by attorney Susan Lea.  Defendants argue that Ms. Lea's letter was withheld and determined to not be legal mail, because they could not verify that Ms. Lea was a licensed attorney in the Colorado

Attorney Registration database.  On June 10, 2009 defendant May was contacted by Susan Lea

via email.  She informed him that she was licensed in California but was also admitted to

practice in federal court in the District of Colorado.  [#37] at 22.  Ms. Lea further stated that she

provided the certificate she received from the United States District Court to the CDOC.  *Id.*  In

her affidavit, Ms. Lea also states that she wrote "Ca. Bar" before her attorney number, indicating

that it was a California bar number.  [#37] at 25.

SCF's mail policy states that incoming mail from a law firm, legal organization, or

attorney marked as "legal" shall include (1) the sending attorney's first and last name, (2) the

sending attorney's attorney registration number (except for attorneys who practice in states

where a number is not issued), and (3) the sending attorney's complete business address.  [#37]

at 51.  This regulation indicates that "legal" mail is accepted and processed as restricted mail

from attorneys with non-Colorado registration numbers and from attorneys without attorney

registration numbers.  If mail does not meet those requirements, the regulation states that it

should be returned to sender.  Defendants apparently did not check the California state database,

but instead determined that Ms. Lea's letter was "suspicious," despite being sent from a known

local legal organization.  Defendants state that the reason for their suspicion of Ms. Lea's letter

was based only on her unverified attorney registration number, but they do not indicate why they

did not comply with the above regulation and did not return her letter to sender but instead

confiscated it.  Although these discrepancies with SCF's stated policy do not prove that May and

Cox-Bergman intentionally mishandled Ms. Lea's letter, it at least indicates a dispute of fact

regarding defendants' handling of Ms. Lea's letter.

Defendants admit that they were mistaken in their determination that Ms. Lea's letter was

improperly labeled as legal mail, but they cite prison safety concerns for why they took the

subsequent actions that it did.  Although the evidence is not conclusive, Mr. Ybanez has

presented sufficient evidence to create a material dispute of fact as to whether his mail was

mishandled and whether Cox-Bergman and May acted intentionally when they did so.  There is

evidence that indicates that it was at least easily verifiable, if not clear, that Ms. Lea's letter was

not intentionally mislabeled as legal mail and therefore should have been processed as such.

It is clearly established that prisoners have the First Amendment right to send and receive

mail and the right to the maintenance of an attorney-client relationship.  *See Wolff v. McDonnell*,

418 U.S. 539, 575-76 (1974).  As discussed above, there is evidence that May and Cox-Bergman

violated that right.  Therefore, a finding of qualified immunity is not warranted as to Claim one

and summary judgment is denied.

*Mishandling of Michael Gallagher's Christmas Card*

Mr. Ybanez alleges that Mr. May intentionally mishandled the Christmas card sent to him

by his criminal defense attorney, Michael Gallagher.  After processing by mailroom staff in the

presence of Mr. Ybanez, Mr. Gallagher's Christmas card for Mr. Ybanez was determined to be

personal, rather than legal in nature.  As such, the mail was not given to Mr. Ybanez, but was

instead sent back to Mr. Gallagher.  Defendants argue that a Christmas card is personal, not

legal, in nature, and thus was handled correctly.

Although Mr. Gallagher was Mr. Ybanez's criminal defense attorney, it is not clear that a

Christmas card qualifies as legal mail under Tenth Circuit case law.  *See Evans v. Mosely*, 455

F.2d 1084, 1087 (10th Cir. 1972) (recognizing that the right of a prisoner to correspond with an

attorney does not necessarily apply to any subject).  Nonetheless, whether or not the card was

incorrectly labeled as "legal" is ultimately inconsequential.  Mr. Ybanez cannot demonstrate that

May, the only defendant alleged with this claim, mishandled the Christmas card or did so

intentionally.  Mr. May is not the party that processed the mail.  He only denied a Step 1

grievance.  Such an action alone is insufficient to demonstrate that Mr. May was deliberately

indifferent to the mishandling of Mr. Ybanez's mail.  Therefore, Mr. Ybanez has not presented

sufficient evidence to demonstrate his involvement in the alleged constitutional violation.  As

there is insufficient evidence to support a finding of a Constitutional violation, Mr. May is

entitled to qualified immunity as to claims arising out of Michael Gallagher's Christmas card.

*Policy for Rejected Legal Mail*

Mr. Ybanez also challenges the policy governing rejected legal mail.  In both instances a

piece of incoming mail marked as "legal" was rejected by the SCF mailroom.  When a piece of

mail that is labeled "legal" is determined to be non-legal, SCF policy requires the mail room to

return the mail to sender.  The offender is then notified that the mail was rejected.  To determine

whether this policy is reasonable, the Court considers the *Turner* factors:

1. Valid, Rational Connection between the Regulation and a Valid Government Interest

Defendants describe the reasons for this policy in great length, but the crux of their

argument is that mail is sent back to the sender in order to discourage the manipulation and

misuse of the prison mail system by falsely labeling mail as "legal" in order to subject it to less-

stringent inspection.  Defendants cite all manner of security and safety dangers that could result

from such mail manipulation.

It is clear that the government has a valid interest in maintaining the safety of all prison

systems – including the mail system.  Defendants argue that the procedures put in place to deal

with mail after it has been determined to be incorrectly labeled aim to prevent offenders, and

those outside of the prison, from manipulating the mail system to avoid inspection.  Further,

defendants argue that by returning the mail to sender, the sending party is educated about DOC's

policies and thus can better comply with future mail.  While it is not clear that returning rejected

mail to the sender is necessary to maintain proper safety, the regulation and the asserted goal are

not "so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90.

### 2. Alternative Means of Exercising the Right

Defendants argue the Mr. Ybanez could have sent the mail to Ms. Lea, who could have in

turn resent the mail to Mr. Ybanez without marking it as legal mail.  Likewise, Mr. Gallagher

could have resent his returned Christmas card.  However, Mr. Ybanez argues that this is not a

true alternative means.  Mr. Ybanez would have to send the mail to the original sender at his own

expense.  Further, the time period in which offenders are allowed to submit their notice to have

the mail resent expired before his grievance was resolved.  Once the time period ends the mail is

destroyed, thus removing any opportunity to re-send, or otherwise receive the mail.  Therefore, if

the offender disagrees with the categorization in the first instance, and challenges it, all

alternatives are effectively removed.  Even "while conscious of the measure of judicial deference

owed to corrections officials," this alternative seems paltry. *Id.* at 90.

### 3. Impact of the Accommodation on Guards and other Inmates

As an accommodation Mr. Ybanez suggests that instead of returning the mail to the

sender, that mail should be re-processed through the regular mail system so that it is then

delivered to the offender as regular mail.  Defendants argue that this accommodation would

"remove all disincentives to falsely label regular mail as legal mail and increase the burden on

the mailroom by increasing the volume of mail incorrectly labeled as legal mail and

simultaneously undermine security."  [#63] at 9.

However, defendants do not explain *how* Mr. Ybanez's accommodation would increase

the number of falsely labeled mail items or increase the burden on the mailroom.  If mail is

determined to be intentionally mislabeled under Mr. Ybanez's alternative system it will be put

through regular processing and will be inspected – thus eliminating any danger of mail

manipulation.  This proposed accommodation does not appear to the Court to be any more

"game-able" then the current system.  Further, the Court fails to see how this accommodation

would increase the burden on the mail room.  Currently, the mailroom determines that the legal

mail is improper, sends a notice to the inmate, and returns the mail to the sender with a

notification.  If the sender re-sends the mail, it is then reprocessed through the regular mail

system.  Under Mr. Ybanez's accommodation, once mail is determined to be improperly labeled

as legal it then is reprocessed as regular mail.  At face value, Mr. Ybanez's accommodation

appears to cut out several steps, or at the least is a net-zero work increase.  The accommodation

certainly does not seem to have the "significant ripple effect" warned of by the *Turner* court.  *Id.*

at 90.

            4. Absence of Ready Alternatives

       As discussed above, Mr. Ybanez has identified what appears to be a ready alternative.  It

is true that "prison officials do not have to set up and then shoot down every conceivable

alternative method of accommodating the claimant's constitutional complaint.  But if an inmate

claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis*

cost to valid penological interests a court may consider that as evidence that the regulation does

not satisfy the reasonable relationship standard."  *Id.* at 91.

       Considering all four *Turner* elements, and the elements before it, the Court finds that

there are disputed issues of material fact regarding May and Cox-Bergman's handling of Ms.

Lea's letter, as well as the reasonableness of the policy at issue.  Therefore, the Court concludes

that summary judgment on Claim One is inappropriate at this time in favor of either party.

### (2)  Return-to-Sender Policy

Mr. Ybanez is also challenging the policy instituted by Warden Milyard that deals with outgoing inmate mail that is "returned to sender" because of improper address or postage. Currently, once a letter marked "return-to-sender" is returned to SCF the mail is not returned to the offender but is destroyed.  A photocopy of the front of the mail is given to the inmate, but there is no opportunity for the inmate to receive the rejected mail or re-send it.

Defendants argue that Mr. Ybanez's argument is barred by the applicable statute of limitations.  Defendants argue that the policy at issue was enacted in July 2007.  "Section 1983 claims accrue, for the purpose of the statute of limitations, when the plaintiff knows or has reason to know of the injury which is basis of his action." *Hunt v. Bennett,* 17 F.3d 1263, 1266 (10th Cir. 1994).  Mr. Ybanez filed a Step 1 Grievance on September 25, 2007 about this policy, and, therefore, defendants argue his claim accrued at that time.  [#37] at 46.  As claims brought under 42 U.S.C. §1983 are governed by a two year statute of limitations, defendants contend that Mr. Ybanez's claim expired on September 25, 2009, one year before this case was filed.  *Blake v. Dickason*, 997 F.2d 749, 750-51 (10th Cir. 1993).

Mr. Ybanez argues that his claim is not barred by the statute of limitation, because he is bringing his claims with regard to the policy that came into effect in December of 2008. Therefore, his complaint was filed within the two year statute of limitations.[2]  In support, Mr. Ybanez points to Administrative Regulation 300-38 which became effective on October 1, 2008. It provides that the returned item will be disposed of at the facilities' discretion.  [#55-1].

---

[2] Mr. Ybanez also argues that defendants' statute of limitation defense has already been rejected by the Court.  The defense was raised in defendants' motion to dismiss.  However, at that time Chief Judge Daniel rejected the argument, determining that it was "unclear when Ybanez first knew or should have known of the SCF Mail Room policy of destroying RTS mail."  [#13] at 14.  Defendants now put forth evidence as to when Mr. Ybanez knew or should have known about the policy.  Therefore, the argument is properly asserted at this time.

Defendants do not dispute that the policy was revised in 2008, but they argue that if Mr. Ybanez

is relying on the 2008 policy, then he cannot rely on his 2007 grievances for exhaustion.

The Prison Litigation Reform Act (PLRA) provides that "no action shall be brought with

respect to prison conditions under section 1983 of this title, or any other Federal law, by a

prisoner confined in jail, prison, or other correctional facility until such administrative remedies

as are available are exhausted."  42 U.S.C. § 1997e (a).  Mr. Ybanez has not presented any

evidence demonstrating that he has exhausted his administrative remedies with regard to the

2008 version of the RTS policy.  While Mr. Ybanez has filed grievances with relation to the

2007 policy, the Court agrees with defendants that the statute of limitations has run on that claim.

Although the Court agrees with Mr. Ybanez that the RTS policy raises many of the same issues

as does the policy regarding rejected legal mail, unfortunately this claim is either barred by the

statute of limitations or has not been exhausted.  Accordingly, summary judgment is granted in

favor of defendants on Claim Five.

### (3)  Compensatory Monetary Damages

Mr. Ybanez is seeking compensatory damages in under with Claim One ("Plaintiff also

requests compensatory damages for the destroyed mail from Susan Lea and the Pendulum

Foundation;" [#5] at 21) and Claim Five.  The latter is now moot.  Defendants argue that under

the PLRA Mr. Ybanez cannot recover for said damages without a prior showing of physical

injury.  The PLRA provides that "[n]o Federal civil action may be brought by a prisoner…for

mental or emotional injury suffered while in custody without a prior showing of physical injury."

42 U.S.C. §1997e (e).  Defendants argue that without physical bodily injury – not just injury to

physical property – Mr. Ybanez cannot recover compensatory damages for mental and emotional

distress.

An alleged First Amendment violation will rarely, if ever, result in physical bodily injuries. The Ninth Circuit and other courts have found that § 1997(e) does not apply to First Amendment claims, because "the deprivation of First Amendment rights entitles a plaintiff to judicial relief wholly aside from any physical injury he can show, or any mental or emotional injury he may have incurred." *Canell v. Lightner*, 143 F.3d 1210 (9th Cir. 1998). However, the Tenth Circuit has directly addressed *Canell* and this issue and concluded that "the plain language of the statute does not permit alteration of its clear damages restrictions on the basis of the underlying rights being asserted." *Searles v. Van Bebber*, 251 F.3d 869, 876 (10th Cir. 2001). Rather, a First Amendment wrong "should not be divorced from the resulting injury, such as 'mental or emotional injury,' thus avoiding the clear mandate of §1997e (e)." *Id.*

Accordingly, Mr. Ybanez cannot recover compensatory damages for emotional or mental distress arising out of his First Amendment violations.

**Order**

1. Plaintiff's Motion for Summary Judgment [#37] is DENIED.

2. Defendants' Motion for Summary Judgment [#43] is GRANTED in part, and DENIED in part.

3. The Court strongly urges the parties to attempt to resolve this case without further litigation or trial. It was apparent to the Court at the Trial Preparation Conference held on November 2, 2012 that the plaintiff is not in this for money. Rather, he believes that the defendants and the SCF mail room have horsed around with his reasonable rights to receive and send mail, and he wants some assurance that the policies and practices will be changed so that this kind of stuff does not continue to happen to him and others. In light of the facts discussed in this order and Chief Judge

14

Daniel's order, it appears that his concerns are not entirely unreasonable.  This need not have resulted in a federal case with, to date, 67 docket entries and a trial now reset for February 19, 2013.  Please make a good faith attempt to resolve this one.

DATED this 20th day of November, 2012.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge

15